GRANT, J.
In promotion of our own burden of conservancy of time and labor, we- shall Hooverize wbat might otherwise be a tedious recitation of various things.
Having read the 118 pages of briefs commended to us, we assume that counsel are sufficiently informed of their case to render extended recitals here unimportant, and the matter is of no particular interest to any but the parties immediately concerned in the disposition of it.
Obeying also this law of parsimony in another respect, we pass by all discussion of the various questions of procedure technically raised by the record. We agree with counsel that all these are merged in the main point of controversy, presently to be stated, and that with this settled, they too have no workable importance.
Addressing our inquiry then to this controlling consideration, it became the duty of the arbitrators named for the purpose to take testimony and from it to find and award to the plaintiff in error the highest market value of the stock theretofore owned by it in the defendant company at any time within the two years next preceding the consolidation; this duty was enjoined by statute.
The arbitrators accordingly proceeded to hear testimony tending, as they said, to fix and establish such highest market value within the period so limited.
The testimony so taken was confined to sales of the stock, actually made within the two year period. Of such sales of the guaranteed stock within that time there were nine in all, aggregating 205 shares, at prices ranging from $478 (one share only) to $460 per share — the low rate being for 14 shares.
Of the nonguaranteed stock, the sales proved were 57 in number, totalling 1787 shares; for these the highest price obtained was $500 per share and the lowest $461.
That these were genuine and hot simulated or collusive sales, *335 is not controverted, nor is it in dispute that they were all the sales known to have been made within the required time.
From this testimony and no other, the arbitrators found that a prima facie ease of market value was made out, within the meaning of the statute, and called on the plaintiff in error to rebut the conclusion, if it could, by proof tending to discredit the sales actually shown. No such proof was forthcoming.
But it contended that sales alone did not and could not establish a “market value” of the stock, prima facie. It maintained that the sales shown were sporadic and occasional only, and that they could not be relied on in any just sense of the term to fix a “market value.”
As countervailing testimony the plaintiff in error offered and suggested a much broader field of inquiry, involving the property represented by the stock and tending, as it claimed, to establish “a fair buying and selling value, ‘market value’ in a broad sense, of upwards of $1,000 a share.”
It would be difficult, within reasonable limits, to particularize this entire offer to prove, but a fair intimation of what the ultimate range of it was, as well as the reason given why an inquiry based upon sales alone would be inadequate to fix a “market value” with any justice to the offerer, may be gathered from the following statement of its counsel at the hearing:
“In part, we expect to be able to show from the books of the company that the preferred stock of the Lake Shore & Michigan Southern Bailway Company during the two-year period had a fair buying and selling value, ‘market value’ in the broad sense, of upwards of $1,000.00 a share; that these figures are based on the property of the company and on its income, properly computed; that the New York Central & Hudson River Railroad Company owned, during the two-year period, approximately ninety per cent of the stock of the Lake Shore & Michigan Southern Railway Company; that the policy of the New York Central management has been to turn fifty per cent or more of the net earnings of the Lake Shore & Michigan Southern Railway Company back into the betterment of the road; that the distribution of dividends to stockholders, compared with the net earnings, has been away below the usual custom of railroad *336 companies; that the turning back of so much of the net income into the road has had a double effect; in the first place, it has lowered the selling price, in sporadic sales, of the small fraction of the stock which is scattered in the hands of the public, and, in the second place, it has increased the value of the stock; that the result is that the New York Central Eailroad Company wishes to appropriate stock worth upwards of $1,000.00 a share for $500.00 a share; that the fact is that the stock has been so valuable that it has been an investment stock; that the only real purchasers for it have been the New York Central Eailroad Company and William A. Eead & Company — very likely the same thing; that there were so few sales of it as to furnish no criterion of its value; that the very fact that stock worth upwards of $1,000.00 a share was sold in three or four instances for less than $500.00 a share shows in itself that the stock had no market, for the doctrine that market value, in the narrow sense, fixes the limit of recovery in conversion and other cases, is predicated upon the fact that taken by and large the sale price approximates the real value.
“It is thus evident,” the brief goes on to say, “that if we could prove what we offered to prove, not only were there too few sales of any kind of Lake Shore stock to show a ‘market value’ proved by selling price, but these selling prices were so abnormally depressed as to be worthless as a barometer of ‘market value.’ ”
But the arbitrators rejected this view altogether, and held that the extraneous considerations could have no proper place in fixing “market value,” and that such value was to be referred to sales only, in the absence of fraud or collusion in making them and no claim being made that they were other than bona fide. We have thus presented the two theories, in substance. The record under review, notwithstanding the discursive outlook of discussion in the briefs, calls upon us only for the adoption of the one or the other of these points of view.
The bearing of the cited cases upon the narrow real question,. considering the particular service which the statute requires of the arbitrators, is for the most part not very obvious. *337 nor do they afford ns much practical aid in resolving the difficulty.
"We assume of course that the arbitrators are bound by the substantial rules of evidence, as courts are upon all basic and controlling points.
Going a little afield from the ordinary line of legal quotation, we find the term “market value” defined in the New International Encyclopedia, as follows:
“Market Value. The value of an article as established by public sales of such property in a particular locality. At times this value is proved by regular market quotations. It is also proved by persons familiar with the price at which such property sells regularly in the market. If the market price is abnormally enhanced or depressed at the time or place for the delivery of any goods, by wrongful combinations or by an illegal monopoly, other evidence than the market sales may be resorted to for the purpose of showing the fair value of the property in question.”
Here the synonym of market value is the sales price, normally. The case at bar is not within the exception which would let in other evidence.
But a very persuasive — we may say coercive — consideration with us at the present time rests in what the legislature itself has done to help us to a conclusion as to what it meant by “market value” when it put that term in its statute. For if we can once ascertain the legislative intent in using the words, judicial inquiry can go no further with legal propriety, no matter how strongly we may — in a proper case — feel that another meaning should be annexed to its expression.
The statute under which the arbitrators acted was passed in its present form, so far as -the term “market value” is the thing required to be fixed is concerned, more than sixty years ago.
It remained in that form on the books, unchanged in this respect, for more than a generation. In 1890 it was repealed and replaced by a provision which really seems to have been framed to conform it to the line of proof offered by the plaintiff in error to the arbitrators and rejected by them.. It was made to *338 coincide, as we read it, with the exact theory propounded in this case by the offers to prove, in its essential respects and evidenced a clear legislative departure from the line of “market value” to its actual value, unless the two values should happen to be the same, and let down the bars into an unlimited field of inquiry as far as the dissenters might care to explore. Its language as to this material point was as follows:
“A stockholder who refuses to convert his stock into the stock of the consolidated company shall be paid at least the actual value of such stock, to be ascertained, not alone from its market value previous to the making of such agreement for consolidation by the directors, but from a consideration of the earning capacity of the road, in which such stock is held without reference to such proposed consolidation, the condition of said road, betterments, cars and other property, its existing connections, and any other facts tending to increase or diminish the value of the stock, such payment to be made before the consolidation takes effect.”
This, it will be seen, was a veritable letter of marque, a roving commission to privateers, to sail the high seas from Wall street to the “off again, on again, gone again’ ’of Finnegan at the switch shanty.
If such were the statute now, it would be conclusive in its support of the plaintiff’s contention. This replacing enactment seems on its face to be an impracticable and wholly unworkable thing. It undertook to furnish a test of value which may overnight so fluctuate as to shift the estimate by hundreds of thousands of dollars. A thunder storm coming up while the ai’bitra-iors were making up their award, might disastrously affect “the condition of said road,” a fire in the sheds might, in the same time, materially reduce the “betterments, cars and other property;” all “existing connections” would have to be, at the peril of the inquirer, inquired into in their remotest ramifications and to their consequences by possibility. And the “any other facts” provision would inevitably make the inquiry endless and interminable and bring up at last at a place which, as I recollect, is somewnere on the line of this very consolidated road — to wit: Point No Point. But it admirably fulfilled the conditions on *339 which the theory of the offered testimony and. line of inquiry was bottomed.
The actual work-out covered only* a couple of years.
The provision last quoted was repealed by the act of 1892, which restored the thing to be found by the arbitrators to the “market value” of the statute of 1856, pure and simple, untangled from the test of actual value allowably to be established by the considerations in that behalf annexed by the statute as it was amended in 1890. By the exclusion from the law as it was when the arbitration was had, of the tests allowed by the repealed act, as tending to fix actual value, aside from “market value”; by this restoration of the ancient landmark, we think the legislature must have acted advisedly and with some end in view. To our apprehension that purpose was to clear the field of inquiry from the particular tests and standards which were in the act of 1890 but were omitted in the law of 1892. This, in our estimation, fairly repels the idea that these particular tests may be read into the statute after having been taken out of it, and, so interpolated, be pressed into the service of proving what “market value” is. If such was the purpose, then the legislature deliberately threw overboard a plain rule and substituted a doubtful one for it. Such an outcome of legislative scrutiny is not to be presumed.
Our opinion is that the arbitrators, in holding that the sales proven to them, in good faith made, were evidence from which a “market value” of the stock might be established, and in rejecting the enlarged scope of inquiry proposed to them, but followed the plain requirement of the statute and the intent of the legislature in enacting it. We can think of no other conclusion which would satisfy the statute and yet do no perceived violence to a just determination of the duty laid upon them by it.
This conclusion of what we must regard as the last legislative expression of the intent and purpose of the statute, to abandon the theory of the case held by the plaintiff in error here, is not materially at variance with, or shaken by, any of the authorities brought forward in the briefs and arguments at the bar, so far as these are in point at all. On the contrary, so far *340 as they are applicable, they seem to us to fortify and support it.
That this consideration of what the legislature meant in bringing the statute back to its rule of first instance after a trial of the opposite rule, was influential in.shaping the decision of the arbitrators to hold - evidence of actual sales sufficient to establish “market value,” and to reject testimony reaching beyond that, is most likely. And in so basing their finding that they were right, we are equally without doubt. If they were, this consideration settles the whole case for us.
Of course in one hundred and eighteen pages of briefs and two hours of oral argument at the bar, a great deal more than this has been said. But that anything else has been said, really to the. purpose, or need be said, is in our opinion extremely doubtful.
We say this to show why no more particular attention is paid to the many, very many, questions urged upon us, but which are, as we think, all contained, in substance, in what has already been said.
We can think of no more satisfactory way of eliciting the truth as to what was the market value of the stock, than that adopted by the arbitrators. If they had entered the fields of controversy proposed to them by the offers to prove, it would, we think, have been at the risk of obscuring and not clearing a correct vision of their one duty. For example, the statement found on pages 44 and 45 of the brief is as follows:
“To show the court, however, that our claims are not without foundation and that we reasonably believe that if opportunity be given we can clearly prove the stock to be of a fair value —market value in the broad sense — of upwards of one thousand dollars ($1,000.00) a share, we may add that the Wall Street Journal, the financial organ of the railroads and other large interests in New York City, -has said that the stock of The Lake Shore & Michigan Southern Bailway Company was worth one thousand dollars ($1,000) a share.”
It is thought by some uncharitable people that the Wall Street Journal not only “has said,” but is in the habit of saying, a great many things besides its prayers, but surely men charged *341 with a duty of fixing values and whose time is worth something, can not be expected to spend it in listening to that kind of first aid to reach a just and reliable conclusion. It is indeed a question, we think, whether the adoption of the offer would have been effectual either in the “broad sense” ostensibly sought, or in the broad cents really struggled for.
Although there are several assigned grounds of error before us, the foregoing intimations it is believed dispose of the substance of them all.
We find none of them to be of controlling merit towards disturbing the action of the arbitrators or the consequent judgment under review. In our opinion that judgment in each case does substantial justice between the parties to it.
It is, therefore, affirmed.
Leig’hley and Dunlap, JJ., concur.